## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Edell Jackson,<br><br>    Plaintiff,<br><br>v.<br><br>Brooklyn Center Police Dept., et al.,<br><br>    Defendants. | Case No. 21-cv-2072 (SRN/DJF)<br><br><br>**ORDER ON BROOKLYN CENTER<br>DEFENDANTS' MOTION FOR<br>JUDGMENT ON THE PLEADINGS** |

Nicholas Ratkowski, Contreras & Metelska, P.A., 663 University Ave. W., Ste. 200, Saint Paul, MN 55104 Minneapolis, MN 55402, for Plaintiff.

Jason M. Hiveley, Aaron Mark Bostrom, and Julia Kelly, Iverson Reuvers, 9321 Ensign Ave. S., Bloomington, MN 55438, for City of Brooklyn Center, Officers Jake Wilkins, Stephen Pastor, Joel Iverson, Cooper Gauldin, Ryan Soliday, and Kate Deering, Defendants.

SUSAN RICHARD NELSON, United States District Judge

   This matter is before the Court on the Motion for Judgment on the Pleadings [Doc. No. 43] filed by the City of Brooklyn Center ("the City"), and Brooklyn Center Police Officers Jake Wilkins, Stephen Pastor, Joel Iverson, Cooper Gauldin, Ryan Soliday, and Kate Deering (collectively, the "Brooklyn Center Defendants"). For the reasons set forth below, the Brooklyn Center Defendants' motion is granted.

## I.  BACKGROUND

   Plaintiff Edell Jackson brings this action under 42 U.S.C. § 1983, alleging that his apprehension and arrest by law enforcement officers with the Brooklyn Center Police

Department ("BCPD") and the Hennepin County Sheriff's Department on January 14, 2021 was unconstitutional.[1]

### A.      Apprehension and Arrest

Jackson asserts that on that day, he had just begun to back out of a parking space adjacent to apartment buildings in Minneapolis when he was "suddenly surrounded by police vehicles." (Second Am. Compl. [Doc. No. 23] ¶¶ 92–93.)  He contends that he was unaware of officers' intent to arrest him and was unaware of any existing warrants for his arrest.  (*Id*. ¶ 94.) Jackson alleges that next, "[w]ithout warning or provocation," Officer Jake Wilkins violently struck the driver's side bumper of Jackson's truck, preventing him from exiting the parking lot.  (*Id*. ¶ 95.)  Jackson asserts that shortly thereafter, Officer Ryan Soliday "forcefully, and at an excessive rate of speed, violently rammed his squad car directly into the driver's side of Plaintiff's vehicle," striking Jackson's knee and leg and causing him to hit his head on the truck's interior grab bar.  (*Id*. ¶¶ 97–98.)  In addition, Jackson alleges that the impact of the collision forced his truck backward into a snowbank. (*Id*. at ¶ 98.)  Jackson contends that while Officers Wilkins and Soliday blocked his truck from the front and driver's side, other officers blocked it from the rear, and a high fence alongside the passenger side of the vehicle blocked any other means for the truck to exit. (*Id*. ¶ 99.)

---

[1] Pursuant to the parties' stipulation, the Court has since dismissed the defendants with the Hennepin County Sheriff's Department [Doc. Nos. 66, 68].  Therefore, the Court generally limits its background discussion to facts concerning the remaining Brooklyn Center Defendants.

Effectively hemmed in, Jackson alleges that multiple officers then "descended upon [his] vehicle with weapons drawn," screaming at him to get out of the car and put his hands up.  (*Id*. ¶¶ 100–01.)  As he attempted to unfasten his seatbelt, officers yelled that he was reaching for a gun.  (*Id*. ¶ 102.)  After unfastening his seatbelt, he used the passenger side front door to exit the truck, as the driver's side door was dented inward from the collision and was unusable.  (*Id*. ¶¶ 103–04.)  Jackson contends that he immediately raised his hands and kept them above his head.  (*Id*. ¶ 105.)

### B.    Tasing

Jackson alleges that one of the Defendants "immediately" tased him, striking his left side.  (*Id*. ¶ 106.)  Consequently, he contends, he fell in the snow, and "[i]n the process, [his] coat came off and was left behind[.]"  (*Id*. ¶ 107.)  "Panicked and dazed after being tased," Jackson alleges that he stood up and made his way out of the snow, around to the driver's side of the truck.  (*Id*. ¶ 108.)  At that time, he contends Officer Cooper Gauldin and Sergeant Stephen Pastor both deployed their tasers, striking him simultaneously.  (*Id*. ¶ 109.)  Jackson alleges that he kept his hands up and repeatedly begged the officers not to shoot him.  (*Id*. ¶ 110.)

### C.    Tackling and Tasing

Jackson asserts that "[f]earing for his life," he "continued to keep his hands up and attempted to distance himself from Defendants and their tasers."  (*Id*. ¶ 111.)  However, he alleges that officers, including Officers Gauldin, Wilkins, Joel Iverson, and others, tackled and beat him.  (*Id*. ¶ 112.)  Jackson asserts that as he was tackled, his arms were pinned underneath his body.  (*Id*. ¶ 113.)  He contends that at this time, Officer Gauldin, and

possibly others, "punched him in the ribs repeatedly, while [he] could not move his arms and posed no threat to officers." (*Id.*)

Jackson alleges that officers tased him twice more while he was already restrained and "completely defenseless on the ground in the prone position." (*Id.* ¶ 114.) Specifically, he asserts that Officer Wilkins tased him on the buttocks and an unknown officer tased him on the back. (*Id.*) Jackson alleges that Defendants left him in a prone position for several minutes before rolling him over, checking him for weapons, and finding him to be unarmed. (*Id.* ¶ 115.)

### D.   Medical Care and Processing the Scene of Arrest

As officers brought him to his feet and escorted him to a squad car, Jackson alleges that he felt numbness on his left side, and told officers that he could not breathe and had a tingling sensation in his back and neck. (*Id.* ¶ 116.) An ambulance arrived at the scene to treat Jackson and transport him to the hospital. (*Id.* ¶ 117.)   As a result of Defendants' conduct, Jackson asserts that he suffered bruising to his head and a split lip, and since his arrest, has suffered from recurrent nervous twitches, frequent numbness in his forearms, difficulty fully extending his wrists and fingers due to his hands seizing up,  recurring pain in his left knee, pain in his neck that feels like a pinched nerve, pain in his lower back which now frequently makes a clicking noise when he moves; Post-Traumatic Stress Disorder; difficulty sleeping, and fear of law enforcement officers. (*Id.* ¶¶ 164–70.)

While Jackson received medical attention, Officer Kate Deering assisted the Hennepin County Crime Lab in processing the scene of his arrest, and recovered Plaintiff's jacket alongside his truck. (*Id.* ¶ 120.)  In her police report, Officer Deering noted that the

imprint of a gun magazine was clearly visible through the pocket of the jacket, and when she opened the pocket, she found a firearm.  (*Id*.)  Jackson, however, alleges that he was unarmed during his confrontation with police officers and was "unaware where this firearm came from."  (*Id*. ¶ 121.)  In fact, he asserts that officers planted it there in order to frame him for the offense of unlawful possession of a firearm.  (*Id*. ¶¶ 120–21, 195–96.)

### E.    Brooklyn Center Police Department's Policies and Customs

Jackson also alleges that the BCPD has a "long history of engaging in excessive force against the civilians they are sworn to protect."  (*Id*. ¶ 122.)  He contends that although the BCPD has less than 50 active officers, it "was investigated at least 88 times for alleged officer misconduct and other department policy violations from 2016 to 2020—more than the majority of law enforcement agencies in the state of Minnesota."  (*Id*. ¶ 141.)  However, he asserts that about a third of investigations resulted in exonerations, while nearly 40% lacked conclusive evidence.  (*Id*. ¶ 142.)

More specifically, Jackson alleges that in 2013, Officer Soliday shot and killed Edmond Fair during a traffic stop, and Soliday's partner at the time was Officer Deering. (*Id*. ¶ 124.)  Jackson also asserts that in 2014, BCPD officers shot and killed 18-year-old Jonathon Mar, after he led them on a high-speed chase, then exited his vehicle and repeatedly stabbed himself.  (*Id*. ¶¶ 125–26.)  Jackson contends that in 2015, BCPD officers tased Sinthanouxay Khottavongsa, causing him to fall, hit his head, and subsequently die. (*Id*. ¶¶ 127–28.)  He further asserts that in 2019, BCPD officers shot and killed Kobe Dimock-Heisler, who, Jackson alleges, held a hammer and knife while fighting with his grandparents, but was disarmed before police arrived.  (*Id*. ¶¶ 130–31.)  Jackson also

contends that in 2019, BCPD officers used unjustifiable and unreasonable force against a Black teenager, who was applying for a job at a Michael's store, and whose interaction with the police was investigated by the Minnesota Department of Human Rights.  (*Id.* ¶¶ 132–35.)  Finally, Jackson notes the 2021 killing of Daunte Wright by a former BCPD officer who mistook her gun for a taser.  (*Id.* ¶¶ 136–38.)

Jackson contends that these incidents and investigations gave the City an opportunity to review and discipline its officers, but it has deliberately disregarded officers' unlawful acts and has instead indemnified them, in violation of Jackson's constitutional rights.  (*Id.* ¶¶ 143–44.)

In addition, Jackson alleges that while the BCPD's Code of Conduct and Use of Force Policy Manual mandate that officers use only "the amount of force that appears reasonably necessary . . . to accomplish a legitimate law enforcement purpose," the lack of enforcement and discipline of violators shows that the BCPD and the City have failed to enforce their written policies.  (*Id.* ¶¶ 146–47.)  In addition, Jackson cites to provisions in the Use of Force Policy Manual that he contends Defendants violated here, including:  (1) the issuance of verbal warnings prior to the use of a taser; (2) the circumstances under which officers should use tasers; and (3) the circumstances under which officers should ram a suspect's vehicle.  (*Id.* ¶¶ 149–56.)  Jackson contends that officers in the BCPD regularly use tasers and pursuit intervention tactics that are impermissible under the Department's own policies, illustrating "the presence of a custom allowed and encouraged by the BCPD and Brooklyn Center."  (*Id.* ¶¶ 158–59.)

### F.    Criminal Charges and Conviction

Based on the underlying events of January 14, 2021, described, in part, in Jackson's Second Amended Complaint, law enforcement authorities charged him in federal court for being a felon in possession of a firearm. *United States v. Jackson*, 21-cr-51 (DWF/TNL) [Doc. No. 6]. In Jackson's pleadings in the instant civil matter, he acknowledges the then-pending criminal case, stating that he does "not intend to plead guilty to that crime because the gun that was alleged to have been found was not Plaintiff's and has no connection to Plaintiff." (Second Am. Compl. ¶ 121.)

In March 2022, Jackson proceeded to trial. Testifying at trial, Jackson admitted that he possessed the gun that officers recovered from his jacket. (BC Defs.' Answer [Doc. No. 29]; BC Defs.' Ex. 17 (Mar. 9, 2022 Tr.) at 15, 19–20.) The jury found him guilty, *Jackson*, 21-cr-51 (DWF/TNL) [Doc. No. 67], and Jackson is now serving a sentence of 108 months. *Id.* [Doc. No. 108].

### G.    Claims at Issue

Approximately six months before his criminal trial, Jackson filed this civil rights lawsuit on September 20, 2021, asserting three federal law claims[2] and three state law claims against the Brooklyn Center Defendants.[3] Jackson raises the following federal

---

[2] Jackson initially asserted an additional federal claim in Count 2, alleging a violation of his right to procedural due process. (Second Am. Compl. ¶¶ 185–97.) However, pursuant to the parties' stipulation of dismissal, the Court has dismissed Count 2 with prejudice [Doc. No. 42].

[3] As noted earlier, Plaintiff also initially sued sheriff's deputies with the Hennepin County Sheriff's Department, (Second Am. Compl. ¶¶ 69–89), who are no longer part of this lawsuit due to a stipulated dismissal [Doc. Nos. 66, 68].

claims under 42 U.S.C. § 1983:  (1) Fourth Amendment violations for unreasonable seizure and excessive force based on (a) Officer Soliday's ramming of Jackson's truck door; (b) Sergeant Pastor and Officer Wilkin's conduct in tasing him shortly after he exited the truck; (c) Officer Gauldin's takedown of Jackson; and (d) the conduct of Officers Gauldin, Iverson, and Wilkins, and others, in beating and tasing him while he was in a prone position and restrained, (Second Am. Compl., Count 1); (2) a claim against the City arising under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), (*id.*, Count 3); and (3) a claim against the City arising under *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989), (*id.*, Count 4).

Jackson's state law tort claims against the City and the Defendant Officers consist of:  (1) battery (*id.*, Count 5); (2) negligence (*id.*, Count 6); and (3) negligent infliction of emotional distress (*id.*, Count 7).

Pursuant to Federal Rules of Civil Procedure 12(c) and 12(b)(6), the Brooklyn Center Defendants move for judgment on the pleadings, arguing that:  (1) Officer Deering must be dismissed because no claim is asserted against her; (2) the Defendant Officers are entitled to qualified immunity on Plaintiff's § 1983 excessive force claims; (3) Plaintiff fails to establish a constitutional claim against the City of Brooklyn Center; and (4) Plaintiff's state law tort claims fail.  (BC Defs.' Mem. [Doc. No. 46] at 17–47.)

## II.   DISCUSSION

### A.   Standard of Review

Motions for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) are treated the same as motions to dismiss for failure to state a claim under Rule 12(b)(6).

That is, in evaluating a motion for judgment on the pleadings, the Court must accept as true the factual allegations in the complaint, must construe all reasonable inferences from those allegations in the light most favorable to the non-moving party, and must only grant the motion if the complaint fails to state a "plausible" claim for relief. *State Farm Auto. Ins. Co. v. Merrill*, 353 F. Supp. 3d 835, 837, 841 (D. Minn. 2018); *see also Potthoff v. Morin*, 245 F.3d 710, 715 (8th Cir. 2001) ("Judgment on the pleadings is appropriate only where the moving party has clearly established that no material issue of fact remains and the moving party is entitled to judgment as a matter of law."). The Court need not accept as true wholly conclusory allegations or legal conclusions couched as factual allegations. *Hager v. Arkansas Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013).

Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). Moreover, "because granting a Rule 12(c) motion 'summarily extinguish[es] litigation at the threshold and foreclose[s] the opportunity for discovery and factual presentation,' courts must treat such motions with the 'greatest of care.'" *Acosta v. Reliance Tr. Co.*, No. 17-CV-4540 (SRN/ECW), 2019 WL 3766379, at *7 (D. Minn. Aug. 9, 2019) (quoting *Comcast Cable Commc'ns, LLC v. Hourani*, 190 F. Supp. 3d 29, 32 (D.D.C. 2016)).

### B.       The Record

The Court ordinarily does not consider matters outside the pleadings on a motion under Rule 12(c). *See* Fed. R. Civ. P. 12(d). The Court may, however, "consider the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record." *Illig v. Union Elec. Co*., 652 F.3d 971, 976 (8th Cir. 2011) (quoting *Mills v. City of Grand Forks*, 614 F.3d 495, 498 (8th Cir. 2010)). Here, in addition to the Amended Complaint, the Court considers public records from Jackson's felon-in-possession criminal case in *United States v. Jackson*, 21-cr-51 (DWF/TNL), which arose from the arrest at the center of this case.

The Court now turns to whether, at this stage in the proceedings, it may consider Defendants' exhibits consisting of video/audio recordings from the Defendants Officers' body worn cameras ("BWCs") and squad car dashboard cameras, without turning the instant Rule 12 motion into a Rule 56 motion for summary judgment.

In *Scott v. Harris*, 550 U.S. 372, 381 (2007), on review of a summary judgment ruling, the Supreme Court held that when "[one party's] version of events is blatantly contradicted by the [video] record," courts must view the facts "in the light depicted by the videotape."

Jackson acknowledges that the Court may review videos that are necessarily embraced by the pleadings. (Pl.'s Opp'n [Doc. No. 64] at 3–4 (citing *Waters v. Madson*, No. 17-cv-93 (PAM/SER), 2017 WL 6403099, at *9 n.1 (D. Minn. Dec. 14, 2017), *aff'd* 921 F.3d 725 (8th Cir. 2019) (in granting defendants' motion to dismiss, the court considered security footage and squad car footage attached to their motions); *McDowell v.*

*Gonzalez*, 820 Fed. App'x 989, 992 (11th Cir. 2020) (holding that consideration of body camera footage on a motion to dismiss was proper because it was "central to the amended complaint and was undisputed"); *Wagner v. City of Canton, Ohio*, No. 5:19-CV-0377, 2020 WL 1514551, at *3 (N.D. Ohio Mar. 30, 2020) (concluding a video can be considered on a Rule 12 motion if the video "utterly discredits" plaintiff's version of events)).) Moreover, Jackson concedes that the BWC and dashboard videos are necessarily embraced by the pleadings "because their contents are alleged in the complaint and the parties do not question their authenticity." (Pl.'s Opp'n at 4 (citing *Waters*, 2017 WL 6403099, at *9 n.1).) However, he contends that "[a]t the Rule 12 stage, unlike at the summary judgment stage, the Court must assume all facts as alleged are true, subject to the caveats noted above, which will sometimes cause a video that might be dispositive at summary judgment to be nondispositive on a Rule 12 motion." (*Id.*) The Court construes this to reflect Jackson's understanding that a district court may consider, on a motion to dismiss, video evidence that is undisputed, central to the case, and entirely inconsistent with the plaintiff's allegations.

Indeed, in this District, courts have found similar video and video evidence to be embraced by the pleadings and properly considered on a motion to dismiss, without converting the Rule 12 motion into a summary judgment motion. *Ching v. City of Minneapolis*, ___ F. Supp. 3d ___, No. 21-CV-2467 (KMM/DTS), 2022 WL 4364790, at *3 (D. Minn. Sept. 21, 2022) (finding BWC videos proper to consider on motion to dismiss where plaintiff did not dispute their authenticity, nor their completeness), *appeal filed* (8th Cir. Oct. 18, 2022); *Vernio v. Higgins*, No. 19-cv-3024 (DWF/LIB), 2020 WL 3542757, at

*1 n.1 (D. Minn. June 30, 2020) (finding two dispatch calls and BWC video, submitted as exhibits to motion to dismiss, were referenced in and embraced by the complaint, and proper to consider); *Anderson v. St. Luke's Hospital*, No. 19-cv-106 (MJD/LIB), 2019 WL 7882118, at *3 n.5 (D. Minn. Nov. 19, 2019) (considering dashcam videos on a motion to dismiss where the incident depicted in videos was central to plaintiff's complaint, videos were referenced in and embraced by complaint, videos' authenticity was unrefuted, and videos "provided much needed context to the allegations in [the complaint]."), *adopting report & recommendation*, 2020 WL 256176 (D. Minn. Jan. 17, 2020); *Waters*, 2017 WL 6403099, at *9 n.1; *but see Yang v. City of Minneapolis*, 607 F. Supp. 3d 880, 890 n.4 (D. Minn. 2022) (declining to consider BWC footage at motion to dismiss stage and noting plaintiff's argument that footage was incomprehensible, failed to identify the individuals depicted, and used inconsistent time-stamps).

In addition, on appeal of Rule 12 district court rulings, the Eighth Circuit has also considered video evidence of underlying events.  For example, in *LeMay v. Mays*, 18 F.4th 283, 288–89 (8th Cir. 2021), the Eighth Circuit reviewed two home security videos that showed the defendant police officer's backyard encounter with two dogs that the officer shot.  *Id*. at 289.  However, the videos lacked any audio, and therefore the court found they did not inform the question of whether the dogs were growling, and "[m]ore important, neither video depict[ed] the dogs' behavior leading up to the shootings in a manner entirely inconsistent from the allegations in the complaint."  *Id*.  Thus, while the court considered the video evidence, it was unable to conclude from the footage "that the dogs presented an objectively legitimate and immediate threat to [the police officer]."  *Id*.  Also, in *Waters*,

921 F.3d at 731 n.2, the Eighth Circuit considered defendants' squad car footage and a recording made by the plaintiff, noting that the district court found them to be embraced by the pleadings, and neither party objected to the district court's use of the videos. *Id.*

Consistent with this authority and the standards under Rules 12(b)(6) and 12(c), the Court will accept Plaintiff's allegations as true, but will also consider the BWC and squad car footage to the extent they completely discredit Plaintiff's allegations. Their contents are embraced by the pleadings and the parties do not dispute their authenticity. In fact, Jackson himself relies on video evidence in opposition to this Rule 12 motion. (*See, e.g.*, Pl.'s Opp'n at 13–17, 31, 33.) As in *Anderson*, 2019 WL 7882118, at \*3 n.5, the videos here depict the incident that is central to Plaintiff's complaint and "provide[] much needed context [for] the allegations in [the complaint]." Subject to these standards, the Court summarizes the relevant BWC and squad car videos below in its analysis of Jackson's claims and Defendants' arguments for dismissal.[4]

### C.   Dismissal of Claims Against Officer Deering

As noted earlier, the Brooklyn Center Defendants move for the dismissal of Officer Deering. (BC Defs.' Mem. at 17.) After reviewing Defendants' exhibits, Jackson does not oppose her dismissal. (Pl.'s Opp'n at 4–4.) Accordingly, the Court grants the Brooklyn Center Defendants' motion in this regard and dismisses Defendant Kate Deering from this action with prejudice.

---

[4] The Brooklyn Center Defendants filed these video exhibits under seal and they are reflected in the docket at Docket No. 30, Exs. 1–15.

### D.     Section 1983 Claims

In response to Jackson's § 1983 claims against them, the Defendant Officers assert qualified immunity from suit and move to dismiss on this basis.

#### 1.     Qualified Immunity

Qualified immunity protects government officers from § 1983 liability "unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." *Brown v. City of Golden Valley*, 574 F.3d 491, 495 (8th Cir. 2009).  Thus, the Court must perform a two-part analysis to determine if qualified immunity applies:  (1) decide whether the facts show the violation of a constitutional or statutory right, and (2) determine whether that right was clearly established at the time of the alleged misconduct.  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Saucier v. Katz*, 533 U.S. 194 (2001)).  The Court may analyze either step first.  *Id.* at 236.  Qualified immunity "is an *immunity from suit* rather than a mere defense to liability . . . [and] it is effectively lost if a case is erroneously permitted to go to trial."  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Qualified immunity is a question of law for the court to decide. *Littrell v. Franklin*, 388 F.3d 578, 584 (8th Cir. 2004).

#### 2.     Excessive Force Under the Fourth Amendment

The Fourth Amendment of the Constitution protects individuals against "unreasonable searches and seizures."  U.S. Const. amend. IV.  Excessive force claims are "seizures" subject to the reasonableness requirement of the Fourth Amendment.  *See Graham v. Connor*, 490 U.S. 386, 395 (1989).  Because "reasonableness" is an objective standard, "an officer's evil intentions will not make a Fourth Amendment violation out of

an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id*. Rather, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id*.; *see also Kohorst v. Smith*, 968 F.3d 871, 876 (8th Cir. 2020). Moreover, the analysis of reasonableness must "allow[] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397.

The Supreme Court held in *Graham* that determining whether a police officer acted "objectively reasonably" requires balancing the particular facts and circumstances of each case in light of the following three factors (the "*Graham* factors"): (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or to others; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Id*. at 396. Applying these factors to cases involving the use of force, the Eighth Circuit has observed that "[t]he use of force is least justified against a nonviolent misdemeanant who does not flee or actively resist arrest and poses little threat to officers or the public, whereas "somewhat more force" may be required against a passively resistant suspect. *Kohorst*, 968 F.3d at 876 (citations omitted). Failure to follow officers' instructions "may constitute passive resistance," and the Eighth Circuit "[has] upheld the use of force where a suspect is non-compliant and resists arrest or ignores commands from law enforcement." *Id*. (citations omitted).

Because "[l]iability for damages for a federal constitutional tort is personal, [] each defendant's conduct must be independently assessed." *Faulk v. City of St. Louis*, 30 F.4th 739, 744 (8th Cir. 2022) (citing *Wilson v. Northcutt*, 441 F.3d 586, 591 (8th Cir. 2006)). Accordingly, the Court considers Jackson's § 1983 allegations against each Defendant Officer.

### a.   Officer Soliday's Conduct in Striking Plaintiff's Vehicle

In order to determine whether qualified immunity applies, the Court first turns to whether the facts show the violation of a constitutional or statutory right. *Pearson*, 555 U.S. at 232.

To recap, Jackson alleges that by "ramming the driver's side of Plaintiff's vehicle while it was stopped and parked," Officer Soliday violated his Fourth Amendment right to be free from unreasonable seizures and excessive force  (Second Am. Compl. ¶ 180.)  He contends that on January 14, 2021, he was in his truck and had just begun backing out of a parking spot when police officers surrounded him.  (*Id*.  ¶¶ 92–93.)  Officer Wilkins allegedly drove toward him, blocking the front of his truck, and Officer Soliday rammed the driver's side door with his squad car, using such force it propelled Jackson's truck into a snowbank.  (*Id*. ¶ 97.)  Jackson contends that he had no knowledge of officers' intent to arrest him, he was unaware of any warrant for his arrest, and Officer Wilkins' blocking action was "without warning or provocation."  (*Id*. ¶¶ 94–95.)  Jackson thus alleges and suggests that officers surrounded him out of the blue, with no basis for doing so.  (*Id*.)

The video evidence, which includes audio and squad car data, such as driving speed, entirely contradicts any allegation or suggestion that Jackson's police encounter occurred

in a vacuum, and provides much needed context.  Accordingly, the Court will consider the BWC and squad car videos that depict events leading up to and showing, in real time, Jackson's encounter with police.  *See Anderson*, 2019 WL 7882118, at *17 (consulting officers' dashcam videos where Plaintiff failed to allege the circumstances under which officers encountered him); *cf. LeMay*, 18 F.4th at 288–89 (considering home security videos, but finding that they failed to depict dogs' behavior leading up to police officer's shooting of them in a manner entirely inconsistent from the allegations in the complaint).

At approximately 4:00 p.m. on January 14, 2021, Brooklyn Center Police Officers received a dispatch of a shots fired incident related to a domestic assault.  (BC Defs.' Ex. 11 (Deering BWC) at 4:01:20-4:03:04.)  Officer Kate Deering met with the assault victim, who identified Jackson as both her boyfriend and the perpetrator of the assault.  (*Id*. at 4:16:11-12.)  The victim, who gestured to facial injuries she attributed to the assault, reported that Jackson had punched her in the head, torso, and arms, and kicked her on the ground.  (*Id*. at 4:17:53-4:18:15, 4:20:30-35, 4:23:10-25.)  In addition, she stated that Jackson had shot at her with a revolver, narrowly missing her feet, had a warrant out for his arrest, and in the past, he had threatened her with a weapon, used a weapon against her, and choked her.  (*Id*. at 4:16:24-4:17:14, 4:30:43-4:31:12.)  The victim also stated that Jackson had a semiautomatic pistol with him that day, in addition to the revolver.  (*Id*. at 4:16:34-42, 4:22:08-15, 4:30:54-4:31:07.)  The victim provided Jackson's birthdate and digital images taken that day showing Jackson's current clothing and appearance.  (*Id*. at 4:18:03-4:19:21, 4:20:40-47, 4:33:21-37.)  In addition, through a location-sharing service on her cell phone, the victim shared Jackson's cell phone location with Officer Deering

17

and provided the license plate number of his white Chevy Avalanche. (*Id*. at 4:16:42-4:17:10, 4:20:48-4:21:13, 4:29:31-38.)

As Officer Deering gathered this information, she simultaneously relayed it over her police radio, and either Officer Deering or a dispatcher provided it to the other responding officers. (*Id*. at 4:19:20-45, 4:20:11-19, 4:21:29-50, 4:28:28-35, 4:32:50-4:34:22, 4:46:37-52, 4:48:33-38; BC Defs.' Ex. 2 (Soliday Squad) at 4:21:33-37; BC Defs.' Ex. 7 (Pastor BWC) at 4:19:01-:44.) One of the responding officers looked up Jackson's information on a law enforcement database, and stated over the police radio that the warrant issued against Jackson was for fleeing from the police. (Pastor BWC at 4:19:45-:55.)

In preparation for a possibly "high risk stop" of Jackson, Officer Soliday gathered with other officers in a parking lot a few blocks from where Jackson was located. (Pastor BWC at 4:25:32-4:25:48, 4:53:52, 4:59:01-:03; Deering BWC at 4:27:37-4:28:19, 4:51:03-56; Soliday Squad at 4:27:37-:53.) Officers had confirmed Jackson's cell phone location tracking information, finding a white Chevy Avalanche in that location, and they observed a man who matched Jackson's description going into a building, then coming out again. (Deering BWC at 4:27:49-51, 4:42:50-:52, 4:44:37-39, 4:51:52-53; Pastor BWC at 4:58:11-:18.) At approximately 4:58 p.m., officers decided to "take this guy in . . . before he has a chance to flee." (Soliday Squad at 4:58:46-:56.)

Officers quickly drove a few blocks to Jackson's location. (Soliday Squad at 4:59:40-47.) Led first by an unmarked squad car, Officer Wilkins followed in a marked squad car with emergency lights and spotlight activated, with Officer Soliday behind him, in an unmarked car. (*Id*. at 4:59:43-49; BC Defs.' Ex. 4 (Wilkins Squad) at 4:59:36-47.)

As the officers entered the parking lot, Jackson, who was facing outward toward the officers, quickly drove several feet in reverse, with enough speed to lodge a rear wheel in a snowbank, and make contact with telephone pole support cables. (Wilkins Squad at 4:59:44-:51; Soliday Squad at 4:59:46-:50; Pastor BWC at 5:00:10-:14.) Seeing Jackson's actions, Officer Wilkins reported over the police radio, "He's fleeing! He's fleeing!" (BC Defs.' Ex. 3 (Wilkins BWC) at 4:59:50-:51; Soliday Squad at 4:59:50-:51; Pastor BWC at 4:59:50-:51; BC Defs.' Ex. 9 (Gauldin BWC) at 4:59:50-:51.)

Officer Wilkins immediately drove his marked squad car forward, hitting or at least blocking the front of Jackson's truck, near Jackson's driver's side headlight. (Second Am. Compl. ¶ 95.) Seconds later, Officer Soliday then drove his unmarked squad car into the driver's side door of Jackson's truck in an effort to box in Jackson's truck. (*Id*. ¶ 96.) While Jackson alleges that Officer Soliday drove at an "excessive rate of speed" and "violently rammed" his squad car into Jackson's driver's side door such that the impact propelled his truck into the snowbank, (*id*. ¶¶ 95–97), the video evidence utterly refutes these allegations. Jackson himself drove his truck backwards into the snowbank, (Wilkins Squad at 4:59:44-:51; Soliday Squad at 4:49:46-:53), and Officer Soliday's squad car video recorded that he was traveling at only 11 miles per hour when he rammed Jackson's truck. (Soliday Squad at 4:59:52-:54.)

These facts do not show a violation of Jackson's Fourth Amendment rights. Applying the first of the three *Graham* factors—the severity of the crime at issue, 490 U.S. at 396,—prior to the encounter between Jackson and the officers, officers were dispatched because of a report of shots fired related to domestic assault, and were informed that

Jackson had just assaulted his girlfriend and shot his gun at her, was armed with two firearms, and was the subject of an active arrest warrant for fleeing the police.

Jackson contests the existence of the arrest warrant as well as "Defendants' unproven belief that Plaintiff was armed at the time of the arrest." (Pl.'s Opp'n at 8–10; 18–20.)  However, to determine whether Defendants are entitled to qualified immunity, the Court considers the information available to law enforcement officers at the time.  *See Bagby v. Brondhaver*, 98 F.3d 1096, 1098 (8th Cir. 1996) (noting that qualified immunity "gives ample room for mistaken judgments but does not protect the plainly incompetent or those who knowingly violate the law.") (citations omitted).  In Jackson's federal felon-in-possession case arising from the same underlying events, the court found, in the context of probable cause, "Under the totality of the circumstances, a reasonably prudent police officer would believe that the male at this location in the white Avalanche with the matching license plate had committed the alleged assault of [the victim], and evidence of that assault—*including but not limited to the firearm used—would be found in the vehicle*."[5]  *Jackson*, 21-cr-51 (DWF/TNL), Aug. 25, 2021 R&R [Doc. No. 36] at 13, *adopted*, Oct. 20, 2021 Order [Doc. No. 43] (emphasis added).

Jackson also argues that "[t]here is an open question as to whether each of the Defendants who used force against Plaintiff *factually or reasonably believed* that Plaintiff was armed."  (Pl.'s Opp'n at 20.)  But that is not the applicable standard.  Rather, the

---

[5] While the question of whether officers could "prove" Jackson possessed a gun at the time of the encounter is irrelevant for purposes of this analysis, at his criminal trial, Jackson admitted that the gun in his jacket pocket was his.  (Mar. 9, 2022 Tr. at 21.)

standard when evaluating qualified immunity in the context of an alleged Fourth Amendment violation is whether the officers' conduct was objectively reasonable, without regard to individual officers' subjective beliefs. *Graham*, 490 U.S. at 397.

Considering the information available to officers at the time, the Court finds a domestic assault that involved firing a weapon is a violent crime, and an arrest warrant for fleeing police indicates potentially dangerous conduct. Jackson, however, incorrectly focuses on the crime for which he was ultimately charged and convicted—being a felon in possession of a firearm. He characterizes this offense as "a public order crime that does not categorically constitute a crime of violence, as possession of a weapon in and of itself is not evil." (Pl.'s Opp'n at 8–9 (citing legal authority arising under 18 U.S.C. § 822(g)(1)).) Furthermore, Jackson argues that if he had actually brutally assaulted his girlfriend and shot at her with a revolver, "it is inconceivable that Plaintiff would not have been charged with criminal domestic assault," yet no such charges were filed. (*Id*. at 9.) Jackson's focus on the ultimate crime of conviction is misplaced.

Again, because excessive force claims are "judged from the perspective of the reasonable officer on the scene, rather than with 20/20 vision of hindsight," the Court must focus on the information available to the defendant officers in the moments leading up to their contact with Jackson. *Graham*, 490 U.S. at 396. Therefore, the Court must set aside Jackson's irrelevant, rank speculation about subsequent discretionary charging decisions made by the Hennepin County Attorney's Office and the U.S. Attorney's Office. The facts relevant to the severity of the crime at issue show a serious, violent crime—an alleged

domestic assault that involved the discharge of a firearm by a suspect believed to be carrying two guns and who was the subject of an active warrant for fleeing the police.

As for the second *Graham* factor—whether Jackson posed an immediate threat to the safety of the officers or to others, 490 U.S. at 396,—again, officers reasonably believed that Jackson had fired a weapon at his girlfriend, was armed with two guns, and had a history of flight, for which an active warrant was issued. Under these facts, an officer could have reasonably believed that Jackson posed an immediate threat to the safety of others as a general matter, and in particular, by attempting to drive away. *See Hosea v. City of St. Paul*, 867 F.3d 949, 957 (8th Cir. 2017) (finding first two *Graham* factors satisfied where "a reasonable officer on the scene could have concluded that Hosea had committed or was committing domestic assault—a crime that threatens the safety of another individual.") (citing Minn. Stat. § 609.2242, subd. 1(1)).

As for the third *Graham* factor—whether the suspect was actively resisting arrest or attempting to evade arrest by flight, 490 U.S. at 396,—the video evidence entirely contradicts Jackson's allegations that as officers arrived, he was merely reversing from a parking spot, and the impact from Officer Soliday's vehicle propelled Jackson's truck into the snowbank. (Second Am. Compl. ¶¶ 93, 97.) Rather, upon the arrival of multiple police vehicles—nearly all of which were marked police cars with activated lights—Jackson quickly put his vehicle in reverse with such force that it was partially lodged in a snowbank, had made contact with telephone pole support cables, and his wheels continued to spin. (Soliday Squad at 4:59:50-54.) Jackson's wheels spun forward until after Officer Soliday drove his squad car into Jackson's driver's side door. (*Id*. at 4:59:53-56.) Under these

circumstances, a reasonable police officer in Officer Soliday's position could have construed such actions as an attempt to flee or, at the very least, a refusal to stop in the presence of Officer Wilkins' marked squad car, with activated lights. *See Ehlers v. City of Rapid City*, 846 F.3d 1002, 1011 (8th Cir. 2017) (finding that a reasonable officer could have interpreted plaintiff's behavior as noncompliant when he walked away from officer who had ordered him to put his hands behind his back).

In *Johns v. City of Florissant*, No. 4:18-cv-1121 AGF, 2020 WL 7695416, at *2, 5 (E.D. Mo. Dec. 28, 2020), the court considered a police officer's assertion of qualified immunity in a case that began with a traffic stop from which the plaintiff fled in his car. Ultimately, as an officer followed the plaintiff, a collision occurred between the two vehicles. *Id*. at *2. The court noted that "[a]n officer is entitled to use reasonable force to prevent a suspect from fleeing and evading arrest." *Id*. at *5. It found the officer's use of his squad car to prevent the plaintiff from fleeing in his vehicle was not unreasonable under the circumstances, as such flight poses an "obvious threat" "not just to the officer but also to the public." *Id*. at *5 (citing *Gerling v. City of Hermann, Mo*., No. 4:17-cv-02702-JAR, 2020 WL 619509, at *2 (E.D. Mo. Feb. 10, 2020)).

In *Moore-Jones v. Quick*, 909 F.3d 983, 986–87 (8th Cir. 2018), the Eighth Circuit found that a police officer was entitled to qualified immunity for a § 1983 claim based on his actions in using a Precision Immobilization Technique (PIT) maneuver during a low

speed chase after the plaintiff fled a routine traffic stop.[6]   Although the court resolved qualified immunity based on whether the right to be free from a PIT maneuver in such circumstances was clearly established at the time, the facts of the case show that even though plaintiff was non-violent, he had refused commands to stop from an officer in a marked police car, who had engaged his emergency lights, sirens, and spotlight. *Id.* Here, Officer Soliday had reason to believe Jackson was violent, armed, and was fleeing the police, posing a significant danger to others.

In opposition to the instant motion, Jackson urges the Court to consider his subjective intent and knowledge at the time of his arrest.  (Pl.'s Opp'n at 10.)   While conceding they are "somewhat tangential to the two-pronged qualified immunity analysis," but "not wholly unrelated," he contends that at the time of his arrest, following the death of George Floyd and the law enforcement response to ensuing protests, it was reasonable to presume that Defendants' actions "would have an outsized fear-inducing effect on a Black male in Plaintiff's position."  (*Id.*)   While the Court does not diminish Jackson's concerns about his personal safety, "[a]n arrestee's subjective motive does not bear on how reasonable officers would have interpreted his behavior." *Ehlers*, 846 F.3d at 1011.  For example, in *Neal v. Ficcadenti*, 895 F.3d 576, 581 (8th Cir. 2018), the Eighth Circuit declined to consider a § 1983 plaintiff's argument that his initial failure to follow officers' commands was due to natural confusion under chaotic conditions.  The court explained,

---

[6] The PIT maneuver involves using a police car to strike a fleeing car from the side, causing it to spin out.  *See Moore-Jones*, 909 F.3d at 985.

"Law enforcement officers are not required to read a suspect's motivations in failing to obey commands—it is enough that the officer reasonably perceives that the suspect is not following orders as given." *Id*. Thus, the court found that the responding officer "was reasonable in his initial inference that Neal was engaged in an act of passive resistance." *Id*. Accordingly, the Court does not consider Jackson's subjective intent or knowledge.

In addition, Jackson argues that he failed to remain stationary in his truck and wait for officers' commands because one of the officer's vehicles was unmarked, and he was "temporarily blind[ed]" and disoriented by the police searchlight, such that he could not determine whether the Defendant Officers were police officers. (*See* Pl.'s Opp'n at 11–12.) However, the Second Amended Complaint contains no such allegations about Jackson's inability to determine whether the persons he encountered were police officers. To the contrary, Jackson alleges that as he began to back out of his parking spot, "he was suddenly surrounded by police vehicles," and Officers Wilkins and Soliday struck his truck with their "squad car[s]." (Second Am. Compl. ¶¶ 93, 95–96.)

Accordingly, the Court finds that a reasonable officer in Officer Soliday's position could have believed that Jackson had committed a violent assault, was armed, posed a threat to others, and was fleeing from officers, posing a threat to others' safety unless he was stopped. Furthermore, contrary to Jackson's allegation that Officer Soliday "violently rammed" his truck at an "excessive rate of speed," the video evidence, which recorded a driving speed of 11 miles per hour, flatly refutes his claim. Under these facts, the Court finds that Officer Soliday's use of his car to prevent Jackson from fleeing was not objectively unreasonable.

Moreover, under these circumstances, Officer Soliday did not violate a right that was clearly established at the time. *Pearson*, 555 U.S. at 232. In order for a right to be clearly established, it must be "sufficiently clear" that a reasonable official would understand that his or her conduct violates that right. *Dadd v. Anoka Cnty.*, 827 F.3d 749, 756 (8th Cir. 2016) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). In determining whether the rights at issue here were clearly established as of the relevant time, the Eighth Circuit takes a "broad view" of the sources of clearly established law and permits courts to consider "all available decisional law, including decisions of state courts, other circuits and district courts." *Buckley v. Rogerson*, 133 F.3d 1125, 1129 (8th Cir. 1998). Even so, it has stated that a plaintiff must "identify[] controlling precedent with a close correspondence to the particulars of the present case." *Rusness v. Becker Cnty.*, 31 F.4th 606, 615 (8th Cir. 2022) (citing *Anderson*, 483 U.S. at 639–41; *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)).

Again, in *Johns*, 2020 WL 7695416, at \*6, the court found an officer was entitled to qualified immunity for using his squad car to prevent the plaintiff from escaping, even though the officer hit the car at twice the speed as Officer Soliday hit Jackson's truck, the driver was unarmed, and had not committed a dangerous crime. Also, in *Moore-Jones*, 909 F.3d at 985–87, the Eighth Circuit found the right to be free from a PIT maneuver performed in a marked police car with activated emergency lights, siren, and spotlight, to disable the vehicle of a non-violent fleeing driver was not clearly established. Here, Officer Soliday's conduct in ramming his squad car into a suspect's car door to prevent the escape

of a suspect believed to be actively fleeing, as well as violent, armed, and a flight risk, did not violate a clearly established right.

For all of these reasons, Officer Soliday is entitled to qualified immunity based on his actions in ramming his squad car into the door of Jackson's truck.

### b. Conduct of Sergeant Pastor and Officer Gauldin in Tasing Jackson Near His Truck

Sergeant Pastor and Officer Gauldin seek qualified immunity for their actions in simultaneously tasing Jackson as he moved between them, near his truck. While courts are to assess each defendant's conduct individually to assess liability under § 1983, *Faulk*, 30 F.4th at 744, because Jackson alleges that Sergeant Pastor and Officer Gauldin engaged in identical conduct by simultaneously striking him on either side, (Second Am. Compl. ¶ 109), the same qualified immunity analysis applies to both officers.

Jackson contends that after officers immobilized his truck, he exited on the passenger side, and made his way around to the driver's side. (*Id*. ¶ 106.) At that point, he alleges that by "deploy[ing] their tasers, hitting [him] essentially simultaneously," Sergeant Pastor and Officer Gauldin violated his right to be free from unreasonable seizures and excessive force. (*Id*. at ¶¶ 109, 181.) Jackson alleges that "[f]earing for his life," he "continued to keep his hands up" and "attempted to distance himself from Defendants and their tasers." (*Id*. ¶ 111.)

By omission, Jackson's allegations suggest that he complied with officers' commands, but the video evidence flatly demonstrates otherwise, and therefore is appropriate for the Court to consider. (*Supra* at 10–13.) Officer Wilkins' BWC video

shows that as officers commanded Jackson to exit the truck and raise his hands, rather than complying, Jackson almost immediately removed his jacket while running between the passenger side of his truck and the adjacent wall, without raising his hands.  (Wilkins BWC at 5:00:06-09.)  His arms briefly flew up as he lost his footing on the snowbank, fell, and stood up, even though officers commanded him to get on the ground.  (*Id*. at 5:00:09-13.)  Jackson did not stop or stand still.  (*Id*.)  Instead, while moving forward with his hands raised, he asked the officers not to hurt him, and jogged through a group of officers, including Sergeant Pastor and Officer Gauldin.  (*Id*. at 5:00:13-:15.)  Sergeant Pastor and Officer Gauldin stood on either side of Jackson, a similar distance away from him.  (*Id*.)  As Jackson continued to jog forward with his hands raised, Pastor and Gauldin then deployed their tasers at Jackson's left and right sides, respectively.  (*Id*. at 5:00:13-14.)  After they deployed their tasers, Jackson continued to run, sometimes raising his hands while running past more officers, then running more quickly with his hands at his side as he neared a long outdoor corridor between two apartment buildings.  (*Id*. at 5:00:14-:21.)

To determine whether these two officers are entitled to qualified immunity, the Court considers whether the facts show a violation of the Fourth Amendment.  *Pearson*, 555 U.S. at 232.  The video evidence discussed above, and earlier, clearly refutes Jackson's allegations that the simultaneous tasing arose in a vacuum.  (Second Am. Compl. ¶¶ 93–95.)  Under the *Graham* factors, officers were investigating Jackson for a serious, violent crime in which he allegedly fired a weapon at his girlfriend, officers believed him to be armed and dangerous to others, they believed him to be the subject of an active arrest warrant for fleeing police, and they witnessed him actively fleeing and ignoring officers'

commands.  490 U.S. at 396.  In fact, Sergeant Pastor and Officer Gauldin's tasings failed to stop Jackson from running away.  Jackson's allegations concede as much, as he pleads that he "attempted to distance himself from Defendants and their tasers."  (Second Am. Compl. ¶ 111.)  Furthermore, at his criminal trial, Jackson testified that his actions constituted "flight."  (Mar. 9, 2022 Tr. at 47.)

While the Eighth Circuit has held that the "use of [a] taser on a nonfleeing, nonviolent suspected misdemeanant [is] unreasonable," *Brossart v. Janke*, 859 F.3d 616, 625 (8th Cir. 2016) (citations omitted), the court has identified "numerous cases permitting officers to use tasers on noncompliant, violent suspects."  *Franklin v. Franklin Cnty., Ark.*, 956 F.3d 1060, 1062 (8th Cir. 2020) (finding that officer who tased a violent, defiant arrestee at least five times did not violate arrestee's right to be free from excessive force); *Zubrod v. Hoch*, 907 F.3d 568, 572, 580 (8th Cir. 2018) (holding that officers who tased a violent, resisting arrestee up to ten times did not violate the Fourth Amendment). Defendants also point to additional cases in which courts have found the use of a taser or stun gun against a person resisting arrest to be reasonable.  (Defs.' Mem. at 27–28 (citing *McKenney v. Harrison*, 635 F.3d 354, 359–60 (8th Cir. 2011) (finding use of taser reasonable even though suspect had committed minor crimes, never threatened officers, was not suspected of having a weapon, and the force led to his death, because officers "were not required to let him run free."); *Cooke v. Bella Villa*, 582 F.3d 840, 851 (8th Cir. 2009) (holding that officer's use of taser against suspect who stepped out of his vehicle and took one step toward the officer was reasonable during a "rapidly escalating situation," although it was given without warning or after giving commands); *Neely v. Jefferson Cnty.,*

*Ark.*, No. 5:10-cv-40-DPM, 2011 WL 3565585, at *3 (E.D. Ark. Aug. 12, 2011) (finding that suspect's felony warrants and flight from arrest "justified the Taser's intermediate level of force" even where suspect then fell into a pond and drowned).))

Under this legal authority, the facts here do not show a violation of the Fourth Amendment. *Pearson*, 555 U.S. at 232. Rather, a reasonable officer in the position of Sergeant Pastor and Officer Gauldin, with knowledge of Jackson's suspected domestic assault with a gun, his suspected possession of two guns, and his flight risk, would have interpreted Jackson's conduct as noncompliant. *Ehlers*, 846 F.3d at 1011.

Moreover, as to whether Jackson's right to be free of tasing under these circumstances was clearly established at the time, *Pearson*, 555 U.S. at 232, in light of the legal authority cited above, the Court finds that the right of a person suspected of a violent crime, reasonably believed to be armed and the subject of an active arrest warrant for fleeing police, who was actively fleeing and ignoring police commands, to be free from the use of a taser was not clearly established at the time.

Accordingly, Sergeant Pastor and Officer Gauldin are entitled to qualified immunity for their actions in tasing Jackson near his truck.

### c. Officer Gauldin's Takedown of Jackson

As noted earlier, Jackson alleges that as he was "attempt[ing] to distance himself" from the officers, they tackled and "thr[ew] him to the ground."[7] (Second Am. Compl. ¶¶

---

[7] While Jackson generally alleges that "Defendants" tackled and beat him, he believes that Officers Gauldin and Wilkins, along with other named officers who have since been dismissed from this lawsuit, engaged in such conduct. (Second Am. Compl. ¶¶ 112, 182.) In the Brooklyn Center Defendants' Answer to the Second Amended

111–12.)  Jackson does not allege that he was standing still when Officer Gauldin tackled

him.   In fact, in his opposition memorandum, Jackson concedes that "to the extent the

Defendants truthfully and reasonably believed Plaintiff was fleeing after he was tased, the

takedown itself was constitutionally permissible under the circumstances." (Pl.'s Opp'n at

30.)  However, Jackson argues that it was unreasonable for officers to believe that he was

fleeing, and that the officers "did not *factually believe* that Plaintiff was fleeing, meaning

the takedown was unconstitutional." (*Id*.)  He contends that he was not fleeing from arrest,

but "fleeing from the unconstitutional pain and fear the Defendants sought to inflict." (*Id*.)

Again, the focus here is on the objective reasonableness of the officers' actions, not

their subjective beliefs, nor Jackson's personal motivations.   *Graham*, 490 U.S. at 395;

*Ehlers*, 846 F.3d at 1011.   Application of the *Graham* factors weighs in favor of the

objective reasonableness of Officer Gauldin's conduct.   At the time of the takedown,

officers had reason to suspect that Jackson had committed a serious crime, believed he was

both armed and the subject of an arrest warrant, and observed his active flight.

Furthermore, their efforts to stop him by using tasers were unsuccessful.

In *Poemoceah v. Morton Cnty., N. Dakota*, No. 1:20-CV-00053, 2020 WL 8363156,

at *5 (D.N.D. Dec. 29, 2020), *appeal filed* (8th Cir. Jan. 28, 2021), where the plaintiff

acknowledged that he was running away from officers who were moving toward him, the

court found that "[t]ackling him was a reasonable way to get him to stop in this instance,"

---

Complaint, they admit that Officer Gauldin tackled Jackson, and Jackson does not dispute
this. (BC Defs.' Answer ¶ 30).   Accordingly, the Court's analysis of the takedown of
Jackson solely relates to Officer Gauldin's conduct.

even though the plaintiff sustained a broken pelvis as a result.  *See also Karels v. Storz*, 906 F.3d 740, 745 (8th Cir. 2018) (describing takedowns as appropriate when officers face noncompliant arrestees and circumstances fraught with danger and unpredictability).  Here, Jackson acknowledges that he was running away from officers under rapidly unfolding, dangerous circumstances.

 Jackson's conduct stands in contrast to the excessive force used against a domestic violence suspect in *McReynolds v. Schmidli*, who was attempting to comply with officer's commands when he was tackled.  4 F.4th 648, 653–54 (8th Cir. 2021) (reversing district court's application of qualified immunity and finding it was clearly established that the level of force used against suspect who was not resisting, was not a threat, and was not a flight risk, was unreasonable).

Under sufficiently similar circumstances, courts have found that officers have not used excessive force by tackling a fleeing or noncompliant suspect.  *United States v. Dykes*, 406 F.3d 717, 720 (D.C. Cir. 2005) (upholding reasonableness of use of force during *Terry* stop, stating, "because Dykes was in full flight from officers who were justified in stopping him, tackling him was a reasonable method of effectuating the stop."); *Bongiorno v. Perilli*, 537 F. Supp. 3d 367, 377 (N.D.N.Y. 2021) (finding it was objectively reasonable for officer to believe that urgent and forcible action was necessary to prevent plaintiff's escape and to effect the arrest, and reasonable for the officer to take plaintiff to the ground); *Hosea*, 867 F.3d at 958–59 (concluding that tackling of suspect was not unreasonable even after suspect began to lower himself to the ground because "a reasonable officer on the scene could have concluded that Hosea's partial compliance was passive resistance."); *Wertish*

*v. Krueger*, 433 F.3d 1062, 1066 (8th Cir. 2006) (finding officers did not use excessive force where suspected drunk driver failed to comply with orders to exit his vehicle and officers pulled him from the car and took him to the ground); *Carpenter v. Gage*, 686 F.3d 644, 647 (8th Cir. 2012) (holding that officers' actions in taking plaintiff to the ground and tasing him did not constitute excessive force where he had threatened a paramedic with a baseball bat and refused to comply with officers' orders to stop moving around); *Kohorst*, 968 F.3d at 877 (finding that officer's arm-bar takedown and subsequent push to the ground of a resistant, non-compliant suspect did not constitute unreasonable use of force).

Relying on state court authority in the context of criminal suppression motions, Jackson attempts to distinguish between "mere flight" from "resisting arrest," arguing that he was not resisting arrest and had no time to comply with officers' commands.  (Pl.'s Opp'n at 27–28 (citing *State v. Olson*, 634 N.W.2d 224, 230 (Minn. Ct. App. 2001); *State v. Ingram*, 570 N.W.2d 173, 178 (Minn. Ct. App. 1997); *State v. Bergerson*, 659 N.W.2d 791, 798 (Minn. Ct. App. 2003)).)  Viewing Jackson's allegations as true, to the extent they are not clearly contradicted by the video evidence, Jackson had ample time to comply with officers before he led them on a foot chase.  (*See, e.g.*, Wilkins BWC at 4:59:49-5:00:20.) Reasonable officers would interpret Jackson's actions as flight or at least noncompliance.

Jackson further argues that "[i]t is notable that Plaintiff was not charged with resisting arrest," finding it inconsistent with Defendants' "new theory that Plaintiff was resisting."  (Pl.'s Opp'n at 28–29.)   But under the third *Graham* factor, courts consider whether the suspect "is actively resisting arrest *or attempting to evade arrest by flight*." 490 U.S. at 396 (emphasis added).  By continuing to move away from and through a group

of armed, uniformed police officers, with guns pointed directly at him, Jackson was not complying with their continuing commands that he get on the ground or heed the obvious need to stop moving. Reasonable officers would view his conduct in "distancing himself" from them as noncompliant. *Ehlers*, 846 F.3d at 1011 (finding reasonable officer would view plaintiff's actions in walking away from officer who ordered him to put his hands behind his back, even if plaintiff claimed to not hear him, as noncompliant). The fact that Jackson was not charged with resisting arrest is not relevant, as the focus is on whether the officers' conduct on the scene was objectively reasonable.[8] *Graham*, 490 U.S. at 395.

Accordingly, under the facts here, Officer Gauldin's use of force in taking down Jackson—who was believed to be armed, the suspect in a violent domestic assault, and the subject of an active warrant for fleeing police, and who was actively fleeing and "distancing himself" from the officers, even after being tased—was not objectively unreasonable. Accordingly, these facts do not show a constitutional violation. *Pearson*, 555 U.S. at 232.

Moreover, Jackson cites no sufficiently analogous authority for the proposition that at the time Officer Gauldin tackled him, the right of a fleeing suspect who was ignoring officers' commands, suspected of a violent crime, believed to be armed and the subject of a warrant for fleeing police, to be free from physical tackling was clearly established. *Id*.

---

[8] Moreover, as the Court has noted, *supra* at 21–22, even if the prosecuting authorities' charging decisions were relevant to this analysis, which they are not, such decisions are both discretionary and subject to numerous considerations, and the Court will not speculate or draw any inferences from them.

For all of these reasons, Officer Gauldin is entitled to qualified immunity for the takedown.

### d.   Officers Iverson and Gauldin's Conduct in Striking Jackson and Officer Wilkins' Use of a Drive Stun

Jackson also alleges that upon being tackled, Officers Gauldin, Iverson, and Wilkins physically assaulted him.[9]  (Second Am. Compl. ¶ 112.)  Specifically, he asserts that "[a]s he was tackled, Plaintiff's arms were pinned underneath his body.  Defendants held him down and Defendant Gauldin, and potentially others, punched him in the ribs repeatedly, while Plaintiff could not move his arms and posed no threat to officers."  (*Id*. ¶ 113.) Jackson further alleges that Defendant Wilkins tased him in the buttocks "while he was already restrained and completely defenseless on the ground in the prone position," and an unknown officer tased him in the back.  (*Id*. ¶ 114.)

Contrary to Jackson's allegations that he was attacked and tased while he was passive, defenseless, and restrained, the video evidence clearly shows otherwise.  After the initial takedown by Officer Gauldin, Jackson struggled with officers, who commanded him

---

[9] Jackson alleges that Officer Weinzierl and Doe #1 also engaged in this conduct, (Second Am. Compl. ¶ 112), but they have since been dismissed from this lawsuit pursuant to the parties' stipulation. (June 16, 2022 Order.)  Jackson does not specifically allege or argue that Officer Soliday or Sergeant Pastor engaged in the alleged assault, but refers to the involvement of other "officers" or "Defendants" generally.  (Second Am. Compl. ¶¶ 112, 182.)   In the Brooklyn Center Defendants' Answer to the Second Amended Complaint, they identify Officers Gauldin, Iverson, and Wilkins' involvement in the alleged conduct, (BC Defs.' Answer ¶ 30), which Plaintiff does not appear to dispute, and these three particular officers move to dismiss this claim.  (BC Defs.' Mem. at 32–37.) Accordingly, the Court confines its discussion of this claim to the actions of these three Brooklyn Center police officers.

to get on the ground and tried to gain control of him.  (Wilkins BWC at 5:00:31-:40; BC Defs.' Ex. 5 (Iverson BWC) at 5:00:29-:40; Gauldin BWC at 5:00:25-:40.)  As Jackson ignored officers' commands, repeatedly shouting over them, "Don't hurt me!  Don't hurt me!," and continued to struggle, Officer Gauldin struck him in the ribs and stomach three to four times, and Officer Iverson twice struck him in the midsection with his knees and fists.  (BC Defs.' Answer ¶ 30.)  In addition to commanding Jackson to put his hands behind his back, officers ordered him to stop resisting.  (Gauldin BWC at 5:00:34-35.)  The video evidence does not show Officers Gauldin and Iverson applied any physical force to Jackson after he was restrained and handcuffed.  (*Id*. at 5:00:45-:47.)

The Court finds no constitutional violation under these facts.  *See Graham*, 490 U.S. at 396.  Based on shared police radio communications, Sergeant Pastor, Officer Gauldin, and Officer Wilkins had reason to believe that Jackson had engaged in a violent assault during which he had fired a weapon, that he was armed and posed a danger to others, and that he was a flight risk.  Moreover, during their rapidly evolving in-person encounter with Jackson, Jackson had ignored their commands, led them on a foot chase, and continued to struggle against them once he was taken to the ground.  The analysis of objective reasonableness in the use of force allows for consideration of such quickly unfolding, uncertain circumstances.  *Id*. at 397.

Officers may use physical force to gain control of a suspect who appears to be resisting.  *Kohorst*, 968 F.3d at 876 (finding removal of at an least passively resisting, handcuffed suspect from squad car by lifting him with two hands and dropping him to the ground, causing suspect to strike his head, "was not a "gratuitous and completely

unnecessary act of violence.") ; *Schoettle v. Jefferson City*, 788 F.3d 855, 860 (8th Cir. 2015) (determining that it was not unreasonable for officers to strike arrestee in the head and body in an attempt to gain control as he physically struggled with them); *Mann v. Yannell*, 497 F.3d 822, 826 (8th Cir. 2007) (holding that it was not unreasonable for officers to apply force to arrestee's neck and use canine bite to subdue him after he refused to lie on his stomach and continued to resist); *Wertish*, 433 F.3d at 1065, 1067 (finding, where arrestee ignored commands to place his hands behind his back, it was not unreasonable for officers to take him to the ground, climb on top of him and strike him in the head and ribs).

Jackson attempts to distinguish *Carpenter*, 686 F.3d at 849, arguing that there, officers gave the suspect a chance to give his hands to officers and he chose not to comply. (Pl.'s Opp'n at 32.)  In contrast, Jackson argues that it was physically impossible for him to comply with officers' commands to put his hands behind his back because his hands were pinned beneath the weight of his body and the weight of several officers who "dogpiled" on top of him while they "cheekily command[ed] him to provide his hands." (*Id.* at 33.)  Similarly, Jackson argues that officers gave him insufficient time to comply with their commands, and distinguishes applicable legal authority on that basis.  (*Id.* at 32–35 (citations omitted).)

But the video evidence shows that officers were not literally piled on top of Jackson's body, nor that he was rendered immobile, as he continued to struggle with officers after being tased and taken down.  (HC Answer [Doc. No. 27], Ex. F (Hendrickson BWC) at 2:25-2:31.)  At no time during his entire police encounter, from exiting his truck to being tackled, did he voluntarily stop moving or struggling.  The Defendant Officers

here—who knew of Jackson's alleged violent domestic assault, gun possession, and flight history, and had witnessed his noncompliance and flight—could have reasonably believed that Jackson was actively struggling with them, that he was armed and presented a risk to their safety, and that he would not stop resisting unless they struck him.

As to the use of the taser, during the ongoing struggle, Officer Wilkins applied the taser in drive-stun mode to Jackson's right buttock.  (Hendrickson at 2:33; Wilkins BWC at 5:00:34-:42.)  Jackson contends that Officer Wilkins applied the taser when officers already had control of his hands, focusing on a still frame image taken from a BWC video that depicts Jackson face down, with officers' hands holding Jackson's hands behind his back while the taser is pressed against his buttock.  (Pl.'s Opp'n at 33 (citing HC Answer, Ex. G (Weinzierl BWC) at 22:08).)  However, in context, the full video shows that Jackson continued to struggle with officers while they attempted to secure his hands behind his back, and the tasing occurred when officers were still attempting to hold his hands in place in order to handcuff him.  (Hendrickson BWC at 2:34-2:40; Wilkins BWC at 5:00:34-:42.)  The Eighth Circuit has held that officers may reasonably view such conduct as resistance, for which the use of a taser is a reasonable amount of force to arrest or restrain the suspect.  *See, e.g.*, *Kohorst*, 968 F.3d at 878 (finding no constitutional violation for use of taser as "a reasonable officer in [the defendant officer's] position could have perceived Kohorst as resisting arrest and could have feared for his safety."); *Cravener v. Shuster*, 885 F.3d 1135, 1140 (8th Cir. 2018) ("Unarmed, passively resisting subjects can pose a threat necessitating the use of taser force."); *Carpenter*, 686 F.3d at 649–50 (finding that officer could interpret

a suspect laying on his stomach with his hands underneath him and refusing to give his hands to officers as resistant, such that use of taser was not unreasonable).

In sum, a reasonable officer in the positions of Sergeant Pastor, Officer Gauldin, and Officer Wilkins would have interpreted Jackson's ensuing struggle with officers as noncompliance and active resistance, and a continuation of Jackson's refusal to comply with multiple orders. Under such circumstances, it was not objectively unreasonable for Sergeant Pastor and Officer Gauldin to strike Jackson in the ribs and midsection in order to subdue him. Likewise, it was not unreasonable for an officer in Officer Wilkins' position to apply a taser in drive-stun mode to a noncompliant, resisting suspect, whom officers had difficulty handcuffing and restraining. None of these actions were gratuitous or unnecessary, nor were they prolonged. Accordingly, the Court finds that the facts here do not show a constitutional violation. *Pearson*, 555 U.S. at 232.

Moreover, the Court finds, consistent with the authority noted above, that it was not clearly established at the time that an officer could not punch or use a taser in drive-stun mode in order to subdue and restrain an actively resisting suspect who was believed to be armed, involved in a violent assault, and a flight risk, who had just fled from these officers, ignored their commands, and who was not stopped by other intermediate uses of force. *Id.*

Thus, for all of the foregoing reasons, the Court finds that Sergeant Pastor and Officer Gauldin are entitled to qualified immunity for their actions in striking Jackson in order to subdue him, and Officer Wilkins is entitled to qualified immunity for using a taser in drive-stun mode in order to subdue and restrain him.

### E.     *Monell* & *City of Canton* Claims (Counts  3 & 4)

As noted, Plaintiff asserts a § 1983 claim under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), and *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989), against the City.  (Second Am. Compl., Counts 3 & 4.)  Pursuant to *Monell*, 436 U.S. at 690–95, a municipality is a "person" that can be held liable under § 1983, under certain circumstances.  Under *City of Canton*, 489 U.S. at 378, *Monell* liability may attach where a local government fails to train its employees.

### 1.     *Monell* Claim (Count 3)

"Unlike the individual officers, the City does not enjoy qualified immunity." *Mogard v. City of Milbank*, 932 F.3d 1184, 1192 (8th Cir. 2019) (citing *Eagle v. Morgan*, 88 F.3d 620, 628 (8th Cir. 1996)).   However, pursuant to *Monell*, municipal liability may attach where a particular municipal action or policy itself violates federal law or directs an employee to violate federal law, or where the municipal policy is lawful on its face, but "municipal action has led an employee to violate a plaintiff's rights, and that action was taken with deliberate indifference as to its known or obvious consequences." *Hollingsworth v. City of St. Ann*, 800 F.3d 985, 992 (8th Cir. 2015) (cleaned up).

Jackson's *Monell* claim appears to primarily arise under the second circumstance, as he alleges that the City established or approved the BCPD's written policies and training, but deliberately disregarded "the known risk of harm that would result from BCPD's unconstitutional patterns and practices" and was "deliberately indifferent to and/or tacitly authorized the same."  (Second Am. Compl. ¶¶ 203–07.)  Jackson alleges that the City's unlawful customs or practices include the following:  (1) failing to provide for the safety

of arrestees; (2) "turn[ing] a blind eye to and not interven[ing] with the use of excessive force" by the BCPD; (3) "condon[ing] and requir[ing] officers to treat members of the Black Community of Brooklyn Center differently," including through the disproportionate use of force "against Black men who d[o] not pose a threat to officers as compared with any other race or sex demographic"; (4) rendering "the process of filing misconduct complaints against BCPD officers a farce"; (5) tolerating excessive force used against persons suspected of committing violent or firearm-related crimes, "even when those suspicions prove to be ill-founded, and even when those suspicions cannot reasonably lead the officers to believe the suspect will be violent towards the officers at the time of the arrest"; (6) absolving police officers of responsibility for the use of excessive force, thereby ratifying their conduct; and (7) refusing to discipline or terminate officers who have committed misconduct, including the use of excessive force.  (*Id*. ¶¶ 204–09.)  Jackson contends that the City's failure to terminate or discipline its police officers for depriving citizens of their civil rights "is part of its larger custom, policy, or practice of failing to supervise, terminate, or properly discipline its officers for unconstitutional, unlawful, or otherwise improper conduct," resulting in the Defendant Officers engaging in "unlawful acts" toward arrestees, including Plaintiff.  (*Id*. ¶ 215.)

Again, for liability to attach to the City, Plaintiff must plausibly allege that "[the City's] action has led an employee to violate [his] rights." *Hollingsworth*, 800 F.3d at 992. However, as the Court has discussed, the facts here do not show any violation of Jackson's constitutional rights by the Defendant Officers. *See Whitney v. City of St. Louis*, 887 F.3d 857, 861 (8th Cir. 2018) ("[A]bsent a constitutional violation by a city employee, there can

be no § 1983 or *Monell* liability for the City.")  Jackson's allegations to the contrary are flatly contradicted by the BWC and squad car videos.

Furthermore, acts performed pursuant to an unofficial custom must be "so widespread as to have the force of law," consisting of a continuing, persistent pattern of unconstitutional misconduct.  *Perkins v. Hastings*, 915 F.3d 512, 521 (8th Cir. 2019) (citation omitted); *Marks v. Doe 1*, 528 F. Supp. 3d 1008, 1013 (D. Minn. 2021) (citing *Jane Doe A ex rel. Jane Doe B v. Special Sch. Dist. St. Louis Cnty.*, 901 F.2d 642, 646 (8th Cir. 1990)).  Also, the plaintiff must demonstrate "[d]eliberate indifference to or tacit authorization of such conduct by the entity's policymaking officials after notice to the officials of that misconduct," and the custom in question must be "the moving force behind the constitutional violation" to the plaintiff."  *Marks*, 528 F. Supp. 3d at 1013 (citing *Jane Doe A*, 901 F.2d at 646).

Prior incidents of unconstitutional conduct must be factually similar to the incident at issue.  *Mettler v. Whitledge*, 165 F.3d 1197, 1205 (8th Cir. 1999) (finding no custom established where plaintiff failed to show prior incidents were factually similar to officers' confrontation with plaintiff's son).  Jackson alleges six specific incidents involving the use of force by BCPD officers, including one allegation concerning Officer Soliday, all of which the Court assumes as true.  However, these incidents are not factually similar to the facts here.  (Second Am. Compl. ¶¶ 122–38.)  None of the prior incidents involved ramming, tackling, or striking a suspect, (*see id.*), and only one involved tasing.  (*Id.* ¶ 127.)  Not only is the officers' conduct different in the prior incidents that Jackson identifies, none of these incidents involved a suspect in a violent domestic assault, believed

to be armed and a flight risk, who was ignoring officers' commands, and who was actively fleeing police—or even some combination of these facts.

In addition, these six prior incidents, including the single incident involving Officer Soliday, are insufficient to demonstrate a custom that is so widespread that it has the force of law. *See Brewington v. Keener*, 902 F.3d 796, 802 (8th Cir. 2018) (holding two incidents of excessive force, even if assumed true, cannot be considered a pattern of widespread and pervasive unconstitutional conduct) (citing *Smith v. Watkins*, 159 F.3d 1137, 1138 (8th Cir. 1998) ("two specific complaints and various rumors about an officer were not sufficient to establish a policy or custom of condoning unconstitutional conduct."); *Roberts v. City of Shreveport*, 397 F.3d 287, 295 (5th Cir. 2005) (holding that evidence of an officer brandishing his handgun during a traffic stop, committing one other incident of deadly force, and receiving two complaints of excessive force insufficient to establish a pattern of unconstitutional conduct); *Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002) (concluding that eleven incidents were insufficient to establish an unconstitutional pattern)).

Likewise, Jackson's allegations containing general statistics or general descriptions of the BCPD's use of force, the results of investigations, settlements, and "low rate" of disciplinary action, (Second Am. Compl. ¶¶ 123, 139–42, 203–16), fail to allege the specific conduct of the officers and the offenses in question. They do not sufficiently allege a pattern of widespread, persistent conduct. *See Perkins*, 915 F.3d at 523 (finding that statistical evidence of a pattern was insufficient, alone, to support a pattern of the city's failure to investigate).

Moreover, the facts here, as reflected in the BWC and squad car videos, blatantly contradict any allegation that the City's unofficial custom "was the moving force behind the constitutional violation" to the plaintiff." *Marks*, 528 F. Supp. 3d at 1013.

For all of these reasons, the Court finds that Jackson does not plausibly assert a *Monell* claim against the City. The City's motion is granted in this regard and Count 3 is dismissed.

### 2. *City of Canton* Claim (Count 4)

Jackson also asserts a § 1983 claim under *City of Canton*. Jackson alleges that the City acted with deliberate indifference when it failed to properly train or modify its police training related to the use of force and vehicle pursuit intervention techniques, even though it knew of the need for such training or modifications. (Second Am. Compl. ¶¶ 222–27.)

Under *City of Canton*, 489 U.S. 378, municipal liability may attach where: (1) a city's training policies are inadequate; (2) the city acts with deliberate indifference to the rights of others when adopting its policies; and (3) the alleged deficiency actually causes the plaintiff's injury. *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996). However, such a theory is typically not viable in the absence of an underlying constitutional violation by the city employees. *See, e.g., Murray v. Lene*, 595 F.3d 868, 873 (8th Cir.2010) ( "[W]e have consistently held that a municipality cannot be liable under § 1983 unless one of its employees is found liable."). As noted, the facts here do not establish a constitutional violation by the Defendant Officers. Further, to the extent that Jackson alleges the City failed to adequately train its officers to intervene in the excessive use of force, (Second Am. Compl. ¶¶ 222–23), he does allege an underlying claim based on the failure to

intervene.  Moreover, as with Jackson's *Monell* claim alleging an unconstitutional custom or policy, "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (cleaned up); *see also Perkins*, 915 F.3d at 523.  As the Court has found, Jackson has failed to adequately allege the existence of a pattern of similar conduct.

In sum, Jackson does not plausibly assert a claim for failure to train under *City of Canton*.  Accordingly, the City's Motion to Dismiss is granted in this regard and Count 4 is dismissed.

### F.   State Law Claims (Claims 5, 6, and 7)

As noted, Plaintiff also asserts Minnesota state law claims against the City and the Defendant Officers for battery, negligence, and negligent infliction of emotional distress. (Second Am. Compl., Counts 5–7.)  The Brooklyn Center Defendants move to dismiss these claims, arguing that the Defendant Officers are entitled to official immunity and the City is entitled to vicarious official immunity.

The doctrine of official immunity provides that a public official "charged by law with duties which call for the exercise of his judgment or discretion is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong." *Anderson v. Anoka Hennepin Indep. Sch. Dist. 11*, 678 N.W.2d 651, 655 (Minn. 2004) (internal quotation marks and citation omitted).  Official immunity is intended "to protect public officials from the fear of personal liability that might deter independent action." *Janklow v. Minn. Bd. of Examiners*, 552 N.W.2d 711, 715 (Minn. 1996).  In contrast to discretionary

acts, public officials are not entitled to official immunity in connection with ministerial acts, i.e., acts "involving merely the execution of a specific duty arising from fixed and designated facts." *Vassallo ex rel. Brown v. Majeski*, 842 N.W.2d 456, 462 (Minn. 2014) (citation omitted). Under Minnesota law, "The conduct of police officers in responding to a dispatch or making an arrest involves precisely the type of discretionary decisions, often split-second and on meager information, that we intended to protect from judicial second-guessing through the doctrine of official immunity." *Kelly v. City of Minneapolis*, 598 N.W.2d 657, 665 (Minn. 1999). The Defendant Officers' actions on January 14, 2021 in responding to the dispatch call and apprehending and arresting Jackson required them to exercise their judgment and discretion, based on the information available to them, under tense and uncertain circumstances. *Dokman v. County of Hennepin*, 637 N.W.2d 286, 296 (Minn. Ct. App. 2001) (finding officers' conduct in deploying chemical irritants into the home of a person believed to be a danger to himself, who refused to comply with officers' commands, was discretionary, as officers had no way of knowing suspect's real intentions, and were responding to available information under tense and uncertain circumstances).

In the official immunity context, malice "means intentionally committing an act that the official has reason to believe is legally prohibited." *Kelly*, 598 N.W.2d at 663. This determination "contemplates less of a subjective inquiry into malice . . . and more of an objective inquiry into the reasonableness of an official's actions. *State by Beaulieu v. City of Mounds View*, 518 N.W.2d 567, 571 (Minn. 1994). A public official can defeat a claim that he or she acted with malice by meeting any one of the three following tests: (1) that the conduct was objectively legally reasonable, i.e., legally justified under the

circumstances; (2) that the conduct was performed in good faith; or (3) that the right allegedly violated was not clearly established at the time. *Mitchell v. Dakota Cnty. Soc. Servs.*, 959 F.3d 887, 902 (8th Cir. 2020) (citing *Gleason v. Metro Council Transit Ops.*, 563 N.W.2d 309, 317, 318 n.3 (Minn. Ct. App. 1997)).  While Jackson alleges that the Defendant Officers "willfully or maliciously apprehended him in a manner that violated his constitutional rights," (Second Am. Compl. ¶¶ 240, 254, 262), such "bare allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery." *Harlow v. Fitzgerald*, 457 U.S. 800, 817–18 (1982); *see also Semler v. Klang*, 743 N.W.2d 273, 279 (Minn. Ct. App. 2007) (stating that a finding of malice must be based on specific facts showing bad faith).  To the extent Jackson asks the Court to infer that the Officers' actions in ramming his car, tasing him, and striking him constitute bad faith, the Court declines to do so.  Any such inferences or related allegations are implausible as they are utterly belied by the BWC and squad car videos.  For all the reasons previously stated, the Defendant Officers' conduct was objectively legally reasonable and justified under the circumstances. *Mitchell*, 959 F.3d at 902.  Accordingly, the Brooklyn Center Defendant Officers are entitled to official immunity, barring Jackson's intentional and negligence tort claims.  Accordingly, Claims 5, 6, and 7 against the Defendant Officers are dismissed.

As to the City's request for vicarious official immunity, if official immunity applies to a public official, vicarious official immunity generally applies to his or her government employer based on claims arising from the employee's conduct. *Anderson*, 678 N.W.2d at 663–64.  The question of whether to extend vicarious official immunity to a government

employer remains a policy question for the court.  *Hayek v. City of St. Paul*, No. 05-cv-867 DWF/AJB, 2006 WL 2883155, at *8 (D. Minn. Oct. 6, 2006), *aff'd*, 488 F.3d 1049 (8th Cir. 2007) (citing *Pletan v. Gaines*, 494 N.W.2d 38, 42 (Minn. 1992)). Here, the Defendant Officers exercised discretion in deciding to use reasonable force against Jackson.  Because the Court finds no basis for imposing liability on the Officers, the Court likewise finds no basis for imposing vicarious liability on the City.  *Id.* (citing *Dokman*, 637 N.W.2d at 297 ("Vicarious official immunity protects a governmental entity from liability based on the acts of an employee who is entitled to official immunity."). Accordingly, the Court finds that the City is entitled to vicarious official immunity, and Claims 5, 6, and 7 against the City are dismissed.

Because the Court grants this portion of the Brooklyn Center Defendants' motion based on official immunity, the Court need not address Defendants' alternative arguments that Plaintiff's state law tort claims fail on the merits.

## III.  CONCLUSION

In conclusion, the Court finds that Jackson's claims must be dismissed under Rules 12(b)(6) and 12(c).  In reaching this decision, the Court has relied on Jackson's allegations, assuming them as true, unless blatantly contradicted by the Defendant Officers' BWC and squad car videos—videos that both parties agree are authentic and embraced by the pleadings.  The Court has also relied, to a lesser extent, on matters of public record in Jackson's criminal case, *United States v. Jackson*, 21-cr-51 (DWF/TNL).  Under the facts here, repleading would not cure the deficiencies in the Second Amended Complaint, particularly in light of the BWC and squad car videos.  *See Zutz v. Nelson*, 601 F.3d 842,

850 (8th Cir. 2010) (noting that an amendment is considered futile when it "could not withstand a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure."). Nor does Jackson offer any proposed amendments. *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 889 (8th Cir. 2002) (stating that plaintiffs failed to explain how they would amend the pleading, and finding motion to dismiss was properly granted).

Therefore, based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1. The Motion for Judgment on the Pleadings [Doc. No. 43] filed by Defendants the City of Brooklyn Center, and Brooklyn Center Police Officers Jake Wilkins, Stephen Pastor, Joel Iverson, Cooper Gauldin, Ryan Soliday, and Kate Deering is **GRANTED**.

2. This matter is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated: March 6, 2023     <u>s/Susan Richard Nelson</u>
           SUSAN RICHARD NELSON
           United States District Judge